ALLEN et al. v. PARK PLACE WATER, LIGHT & POWER CO. (No. 8578.)*

(Court of Civil Appeals of Texas. Galveston. Oct. 16, 1924. Rehearing Denied Nov. 6, 1924.)

**1. Waters and water courses 🔑201—Water corporation required to supply reasonable demand within capacity.**

Public water supply company is quasi public corporation and assumes obligation to supply all applicants residing within territory in which it operates, if demand is reasonable and within its capacity.

**2. Waters and water courses 🔑201—Water corporation not required to supply water at unreasonable distances.**

Corporations undertaking to supply water for domestic purposes must do so without discrimination, and treat all similarly situated within territory alike with reference to service and rates, but are not required to furnish water at unreasonable distances, which would cause loss.

**3. Waters and water courses 🔑201—Water corporation required to serve without discrimination.**

Water company organized by some of stockholders of corporation whose land was subdivided for residence lots, chartered to supply water "to the public residing at and in the vicinity of" the subdivision, by acceptance of charter and entering into performance of rights thereunder, became obligated to give impartial service to all similarly situated residing within vicinity, regardless of whether they lived on land owned by land company or bought from it.

**4. Waters and water courses 🔑201—Reservation by land corporation of right to lay water pipes held not to relieve water corporation from duty of service.**

Fact that land corporation building subdivision reserved right in selling land to lay water pipes, did not relieve water corporation organized by its stockholders to supply water to subdivision from duty of impartial service to all residents thereof, regardless of whether they lived on land bought from or owned by land corporation.

**5. Constitutional law 🔑154(2) — Requiring water corporation to supply all residents within territory which it was organized to supply, held not impairment of obligation of contract.**

Where water corporation, organized by stockholders of land corporation to supply subdivision and vicinity, had ample water to supply residents thereof without lessening supply of present customers, and was under no contract to serve only those living on property owned or sold by land corporation, to require it to serve those living on other land in vicinity would not be impairment of obligation of contract, contrary to Const. U. S. art. 1, § 10.

**6. Waters and water courses 🔑201—Water corporation may not refuse supply because of anticipated future demand beyond capacity.**

Water supply corporation may not refuse to supply water to residents of territory which it undertook to serve, because at some future time supply of water beyond present capacity may be demanded.

**7. Waters and water courses 🔑201—Water corporation may not refuse supply because of fear of withdrawal of credit.**

Water corporation, organized by stockholders of land corporation to supply residents of subdivision and vicinity with water, may not refuse to supply some of such residents because of fear that land corporation will withdraw credit and force it out of business.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by Rosa C. Allen and others against the Park Place Water, Light & Power Company. From judgment for defendant, plaintiffs appeal. Reversed and rendered.

Andrews, Streetman, Logue & Mobley and Palmer Bradley, all of Houston, for appellants.

Fogle & Gentry, of Houston, for appellee.

LANE, J. This suit was instituted by Mrs. Rosa C. Allen, R. C. Stuart, M. A. Thornton, Ed. McKinney, and A. R. Dietrich against Park Place Water, Light & Power Company to compel it to furnish them with water for their premises situated on 60 acres of land lying in the vicinity of, and adjacent to, the original tract or tracts of land known as Park Place, which said 60 acres was at the time of the filing of this suit, and is now, within the corporate boundaries of the town of Park Place. Upon proper pleadings and upon facts as substantially set out below, the case was heard and judgment was rendered for the defendant.

In the year 1911 a charter was granted by the state of Texas to the "Greater Houston Suburban Corporation," which was organized and incorporated for the purpose of purchasing a tract of pasture land of about 850 acres, situated about three miles south of the city of Houston, with the further purpose and intention of subdividing said land into blocks and lots with the necessary streets and alleys for the accommodation of those who might become purchasers of said lots. The Interurban Railway, extending from Houston to Galveston passes through said 850 acre tract.

On the 9th day of November, 1911, Greater Houston Suburban Corporation, after it had divided 200 acres of said 850 into blocks, lots, etc., had a plat of said land made and had the same duly placed of record, and by an instrument of writing dedicated the said 200 acres as "Park Place" and thereby dedicated the streets and alleys therein to the use of the owners of the land so divided and platted. It was specially stipulated, however, in said instrument as follows:

"First. The fee simple title to each and all of said streets and alleys, both as against the public generally and as against all persons hereafter purchasing lots abutting on the same, is hereby reserved and retained by the said Greater Houston Suburban Corporation and the same is not hereby conveyed.

"Second. Until a lot has been sold abutting on a given street and alley on said plat, said street and alley shall remain the private property of said Greater Houston Suburban Corporation, and may be by it, its successors and assigns, replatted or closed up, or occupied by it or them, at its or their option, and this shall apply to all streets and alleys in said subdivision, the alley in each block shall be and is considered a separate alley.

"Third. Said Greater Houston Suburban Corporation does hereby expressly reserve and retain unto itself, its successors or assigns, as against all the world, and especially as against all who may hereafter purchase or become the owners of lots fronting or abutting on said streets or alleys, an easement therein for the following purposes: (a) The exclusive right to construct, maintain, repair, in any and all of said streets and alleys, single or double tracks, or both, and operate cars thereon by means of animals, electric, .steam, gasoline, or other power, with overhead wires, or underground appliances, or by other means as the said corporation may elect; (b) the exclusive right to do each and every act in or on said streets and alleys, including the erection of poles, stringing of wires for the operation of street railways, telegraph and telephone system, laying of all pipes, construction of conduits and such other construction as may be necessary or convenient in the judgment of said corporation, for propelling machinery or other purposes, calculated in its judgment to make such 'Park Place'- desirable and convenient for business or residence purposes, and this without restriction of any kind or character; (c) the exclusive right to lay, maintain, and keep in repair in each and all of the streets and alleys of said 'Park .Place' water pipes, gas pipes, steam heating pipes, compressed air pipes, and operate the same without any sort of restriction; (d) the exclusive right to erect and maintain on and along each of said streets and alleys, poles and stringing wires and maintaining and operating thereon electric or other wires, and to use and operate the same with electric or other power without restriction of any kind, also the exclusive right to build, maintain, and use conduits, under any and all of said streets and alleys, and to do such digging and excavating in said streets and alleys as it deems necessary for the purpose of laying, repairing, and maintaining all such pipes, conduits, railway tracks, cables and wires, as aforesaid, also exclusive right to construct, maintain, operate and repair in, on, through, or under any and all such streets and alleys, a waterworks system and water sewers, either open or closed. All of the above rights are hereby expressly reserved and retained in and unto said Greater Houston Suburban Corporation, its successors or assigns, and said corporation, its successors or assigns, are to exercise such powers and rights exclusively and without restriction, or restraint, of any kind whatever, in, through,. under, upon, and over any and all of said streets and alleys in said

'Park Place' as the same are now laid out and marked on this plat and map, subject to which are.dedicated as such streets and alleys · for the benefit of those who may hereafter purchase property in said 'Park Place,' but the free use of said streets and alleys for all the purposes above named is to remain the property of said Greater Houston Suburban Corporation, subject to the use of the same for streets and alleys as above provided. The word 'streets' as herein used is defined and shall be construed to mean all highways designated on said plat as 'streets, avenues and boulevards.' "

And on the 20th day of May, 1913, said corporation platted about 200 acres of said 850 acres into blocks, lots, etc., and designated the same as a part of "Park Place" theretofore platted. It also on said date executed a written dedication in terms the same as the one above mentioned. Subsequently said corporation increased its capital stock and by a new charter changed its name to the "Park Place Company." For convenience the two companies will be hereinafter referred to as the "Park Place Company."

The further facts may be shown by the finding of facts of the trial court as follows:

"As a means of developing the property as a residence suburb, the land company dug a water well, erected an elevated water tank with the capacity of 50,000 gallons, installed an engine and pump, and laid water mains and pipes in its subdivision, and represented to prospective purchasers that it would. furnish them water for domestic purposes. In August, 1913, the stockholders of the land company organized the defendant, Park Place Water, Light & Power Company, and procured a charter, the stockholders of the Water Company, at the time of organization, being identical to the stockholders of the Land Company and with the same officers. The records of Park Place Land Company at present show that it has 44 stockholders, 20 of whom are not stockholders in the defendant Water Company, and 24 of whom hold stock in the Water Company.

"The records of the defendant Park Place Water, Light & Power Company show that it has 35 stockholders, 11 of whom are not stockholders in Park Place Company and 24 of whom hold stock in Park Place Company. In other words, the two companies have 24 persons who are common stockholders in both companies; while the Park Place Company has 20 stockholders who hold no stock in the Water Company, and the Water Company has 11 stockholders who hold no stock in the Park Place Company.

"The intention of the organizers in forming the corporation was to purchase the water and light plant from the Land Company, and to supply water and electricity to the territory developed and to be developed by the Land Company. The charter of the Park Place Water, Light & Power Company was filed with, and approved by, the secretary of state of the state of Texas on August 15, 1913, and the purpose stated in the charter of the defendant Water Company is as follows: 'The purpose for which it is formed in the supplying of wa-

ter and the supplying of electric light and motor power to the public residing at and in the vicinity of the subdivision known as Park Place.'

"The defendant Water Company bought the well machinery, buildings, and equipment from the Land Company, paying therefor $10,500 in cash, and giving its note for $4,000; and as a further consideration for the purchase and sale it was agreed between the Land Company and the Water Company that the water and light should be furnished to 'all people residing in Park Place, as now subdivided and as to the future subdivision thereof, who may desire to use either water or light * * * at' stipulated rates, and extensions should be made as required for that purpose, and the Land Company agreed for a period of 10 years, which has now expired, to advance money to the Water Company as the same should be required, if any, in 'extending and repairing water mains, poles, wires, etc., and installing meters or such other uses for which said Park Place Water, Light & Power Company may need money in operation and conducting its business,' in accordance with the terms of the contract attached to defendant's answer. Subsequently, by a mutual agreement between the Water Company and the Land Company and the Houston Lighting & Power Company, an arrangement was made whereby electricity is furnished to said territory by the Houston Lighting & Power Company. The Water Company has continued to furnish water to practically all parts of the original purchase of the Land Company, the farthest service being about 7,000 feet from the Water Company's well. It has also laid the necessary pipes and is furnishing water to two residents of a tract of 17 acres adjoining said 850-acre tract on the west, formerly owned by plaintiff Rosa C. Allen, and now owned by the Land Company and an individual, and the Water Company has undertaken to supply water to the lots and home tracts in said 17-acre tract. This 17-acre tract is triangular in shape and the center thereof is about twice as far from the water plant of the defendant as is the center of the 60-acre tract in which are located the lots of plaintiffs.

"The Water Company has not furnished water, or offered to furnish water, to any person or property outside of said 850-acre tract and said 17-acre tract, except in three instances, where special contracts have been made by the terms of which the service might be discontinued by the Water Company at any time when the requirements of the purchasers from the Park Place Company might demand. Water service has been denied by the company to others living outside of said 850 and 17-acre tracts. In May, 1923, the Water Company entered into a contract with the owners of a tract of 28 acres adjoining on the north the land of the Land Company, whereby, for a stipulated consideration, the Water Company undertook to furnish water service to purchasers of lands in such 28-acre tract, as required for domestic purposes, but no water has yet been furnished thereunder. This 28-acre tract is also in the corporate limits of the town of Park Place and is much further from the plant of defendant than is the 60-acre tract here involved.

"The 850 and 17-acre tracts have been sub-divided into 1,320 building sites, of which 875 have been sold to purchasers who have built or contemplate building homes thereon. About 304 residences have been built on the land, and are occupied and water is being furnished to them. Fifty acres remain unplatted, but the Land Company intends to subdivide it in the near future into about 100 home sites. The Water Company has laid mains to practically all parts of the 850 and 17-acre tracts, except the undivided portion.

"I find that the revenues of the Water Company have not, until recently, been sufficient to pay its operating expenses and necessary repairs and extensions; that it has no credit or borrowing power except with the Land Company; that the Land Company has made advances to the Water Company from time to time to meet the deficit on account of operation and for repairs and extensions of mains and pipes and the drilling of an additional well and for additional pumps and other equipment, for which the Water Company owes the Land Company more than $37,000, for which the Land Company has a lien on all of the property of the Water Company.

"The municipality known as Park Place was incorporated in 1916, as a village or town of less than 2,000 inhabitants. It now has a population of about 1,500, a majority of whom reside on that portion of said 850-acre Park Place Company tract to which the Lum Terrace tract, in which plaintiffs' lots are situated, is immediately adjacent. About 50 acres of the 850-acre tract, which lies outside of the corporate limits, is served by the Water Company. The corporate limits include a 60-acre tract, which has been subdivided and known as 'Lum Terrace,' in which are situated plaintiffs' lots, which they are seeking in this action to have supplied with water by the defendant company. Plaintiff Rosa C. Allen owns altogether between 300 and 400 acres within the corporate limits of which 'Lum Terrace' is a part, and an adjoining 300 acres, not included within the corporate limits; that the tract known as 'Lum Terrace' and the adjoining lands in the corporate limits belonging to Rosa C. Allen are, by reason of their location, suitable for suburban subdivision purposes, but she does not at this time contemplate further subdivision. The 60-acre tract, known as 'Lum Terrace,' has been divided by plaintiff Rosa C. Allen, into 167 lots, of which about 100 have been sold since July 1, 1923. The plaintiffs, other than Mrs. Rosa C. Allen, are purchasers of lots in 'Lum Terrace,' and desire and intend to build residences therein soon. Certain of them have building material now on the lots for building. Trees have been planted along the streets and avenues of 'Lum Terrace' and require water in order to keep them alive. Water is also needed in building the houses. The laying of sidewalks is awaiting the supply of water.

"Plaintiff, Mrs. Rosa C. Allen, has laid water pipes in 'Lum Terrace' addition suitable for carrying water and serving the lots therein, and has extended the line to within three feet of the pipes of defendant Water Company, and tenders in her pleading to the Water Company the use of such pipes without charge until such time as defendant should be required to lay its own pipes and mains. Plaintiffs requested of the defendant company water service to said property and offered to pay charges which are

paid by the present users of water from said company, and to accept the water subject to all reasonable rules and regulations of the company. The defendant company refused to make the connection requested or to furnish such service, or to furnish any water service to plaintiffs. Defendants' pumping plant and tower are about 700 feet from 'Lum Terrace' addition, and defendant's pipe extends to within 186 feet of said addition. The farthest building site in 'Lum Terrace' addition is about 2,000 feet from the water plant. The Interurban Railway Station serving the town is 600 feet from the nearest line of 'Lum Terrace' addition. The greatest distance from the defendant's plant to which it is now furnishing water is 7,000 or 8,000 feet.

"The defendant company has no franchise from the town of Park Place to lay mains or pipes, or to operate in any way within the corporate limits, but its pipes occupy the streets without any affirmative action on the part of the town authorities.

"I find that the present supply of water and pumping capacity is more than sufficient to meet the present needs of the territory now being served by the defendant company, but that it is not sufficient to supply all the territory now being served after it is built up. The present capacity of the wells is about 250,-000 gallons per day, and the present consumption of water is about 140,000 gallons. No other company or individual is now engaged in furnishing water service within the corporate limits of the town of Park Place other than defendant.

"I find that the territory for which service is sought in this suit is not an unreasonable distance from the defendant's water plant, and that no immediate outlay will be required of defendant to supply water to plaintiffs other than that of the actual delivery of its water through its mains."

Under the pleadings of the parties and the facts stated, the trial court reached the conclusion that the defendant company had the legal right to define the limits of the territory which it would undertake to serve, and could not be made to serve those outside of said limits; and that as it had never undertaken to supply water to the territory embraced in the addition of "Lum Terrace," it was under no legal duty to extend service to that territory, and, having so concluded, rendered judgment refusing the connection prayed for by the plaintiffs. All the plaintiffs have appealed.

[1] A water corporation, such as the appellee in the present case, is a quasi public corporation, and assumes the obligation to supply water to all who may apply therefor who reside within the territory in which the corporation undertakes to operate, provided the demand for such water is reasonable and within the capacity of the corporation. City of Houston v. Lockwood Investment Co. (Tex. Civ. App.) 144 S. W. 685; City Water Co. v. State (Tex. Civ. App.) 33 S. W. 259, and authorities therein cited; City of Galveston v. Kenner (Tex. Civ. App.) 193 S. W. 208, approved by the Supreme Court, 111 Tex. 484. 240 S. W. 894.

[2] Corporations which undertake to supply water for domestic purposes to any territory are required to do so without discrimination, and to treat all of those similarly situated within such territory alike with reference to service and rates. City of Houston v. Lookwood Investment Co. and City of Galveston v. Kenner, supra; Ball v. Texarkana Water Corp. (Tex. Civ. App.) 127 S. W. 1068; Ginnings v. Meridian Water Works, 100 Miss. .507, 56 So. 450, Ann. Cas. 1914A, 540.

We are not to be understood, however, from what has been said as holding that a public service water company is under obligation to furnish water on demand to an inhabitant, or a number of them, residing at such a distance from its mains as to make such demand unreasonable, in that to furnish such water would entail a loss to said company. There is, however, no contention in the present case that appellants' properties are at any such distance from appellee's mains, or that appellee could not supply the water demanded by appellants at a profit equal to the profit derived from the water furnished to those whom it is now serving.

The only contentions urged by appellee to support and maintain the judgment of the trial court are, first, that it has at no time, either by the acceptance of its charter from the state, or otherwise, undertaken to furnish water to the territory now covered by the "Lum Terrace" and therefore it is not now, nor has it ever been, under legal obligation to supply such territory or any part thereof with water, no matter how near said territory lies to its mains; and, second, that it is under obligation to the Park Place Company (the Land Company) to furnish water to all those who have purchased any lot or lots from said Park Place Company, or who may in the future make such purchase; and that if all of the lots owned by said land company are improved and a supply of water demanded for the same, the present capacity of appellee's water plant would not be sufficient to supply, over and above such demand, the water demanded by appellants; that it is without credit except with the land company, to which it is indebted in the sum of $37,000, and by inference contends that if it should fail to furnish water to all those who might hereinafter purchase lots from said land company and improve the same, the said company would withdraw its credit and demand payment of the $37,000 due it and thereby practically destroy appellant. We do not think the judgment can be sustained on either of these theories.

[3] It is made clear by the facts shown that the Land Company, as originally incorporated, purchased about 800 acres of pasture land which was intersected by the Galveston-Houston Electric Railway; that it divided said land into blocks, small lots,

streets, and alleys for the purpose of selling the same to prospective purchasers, and no doubt anticipated and expected that by said division and sales a town would be built upon said land, and the territory lying adjacent to and in the vicinity thereof. As an inducement to prospective purchasers to buy, said company erected a water plant to supply water to such purchasers. After the prospective town began to build and grow in population, some of those owning stock in the land corporation, joined by others not stockholders of the land company, formed an organization, bought the original water plant of the Land Company, and thereafter obtained a charter from the state of Texas under the name of Park Place Water, Light & Power Company. In this charter it was declared that the purpose for which said company was formed was to supply water, electric light, and motor power *"to the public* residing at and in the *vicinity* of the subdivision known as Park Place."

We think it indisputably evident from the facts shown that the company thus formed and incorporated, at the time of such formation and incorporation, intended to supply water, light, and power to the residents of the anticipated or prospective town, whether wholly on the land formerly owned by the land company or not, and that since said incorporation it has furnished water and light to those who now reside on the original 800 acres, and also to others who reside on 17 acres formerly owned by appellant, Mrs. Allen, now owned by the Land Company and an individual, and that it has contracted with the owners of a 28-acre tract of land adjoining the land owned by the Land Company on the north to furnish water for domestic uses to such persons as might purchase parts of said 28-acre tract.

While it is true that the acceptance of its charter, a franchise granted by the state, did not obligate appellee to enter into the performance of its charter rights, when it did assume to perform such rights by virtue of such charter, it became obligated to give impartial service to those similarly situated residing within the territory which it undertook to serve; that is, the territory known as Park Place, and that lying contiguous to and in the vicinity thereof upon which it was anticipated that a town would be built. In Dillon on Municipal Corporations, § 1317, the following rule is announced:

"The organization supplying water or light, whether it be a municipal or a private corporation, is under a duty to consumers to supply the water or light impartially to all reasonably within the reach of its pipes, mains, and wires. The public character of the service, the obligation of the municipality to perform its duty towards all the inhabitants without discrimination, and the acceptance of a charter to perform a public service by a private corporation, create this duty, which must be exercised without discrimination between persons similarly situated, and under circumstances substantially the same. The organization furnishing a supply cannot act capriciously or discriminate against anyone who is able to pay for the service furnished. The law will not permit any undue advantage to be given to a consumer by doing for him what is not done for others under circumstances substantially the same. Therefore, whether the supply furnished by a municipal or by a private corporation, the water or the light must be furnished to all who apply therefor, and offer to pay the rates and abide by such reasonable rules and regulations as may be made as a condition of rendering the service."

The rule so stated is supported by numerous authorities. Wyman on Public Service Corporation, vol. 1, § 212; Lumbard v. Stearns, 4 Cush. (Mass.) 62; Olmsted v. Proprietors, 47 N. J. Law, 311; Hyndman Water Co. v. Borough of Hyndman, 7 Pa. Super. Ct. 196.

The charter of the Hyndman Water Company, the appellant in the case cited, contained a clause declaring that the purpose of its organization and incorporation was "for the purpose of supplying to the public, including such residents, etc., of the borough of Hyndman and adjacent thereto as may desire the same." Relative to the duty of the company to supply water, the court in that case said:

"The plaintiff's charter expressly requires it to furnish water to the public within the borough limits and adjacent thereto; it was therefore in duty bound to extend the water service to all who might require it, having due regard for the needs of its customers, the rights of the inhabitants, and the sources of supply."

[4] The rule above announced applies to the water company in the present case, notwithstanding the fact that, in dedicating the streets and alleys of the original Park Place subdivision, the Land Company reserved the right to enter upon such streets and alleys to lay water pipes, gas pipes, set poles, etc., for, by the acceptance of its charter and by its acting by virtue thereof, it has become under the law obligated to supply water to all the residents of the town of Park Place who reside within a reasonable reach of its water mains to the extent of its ability so to do.

Having disposed of the first contention offered in support of the judgment, we now come to a discussion of the second contention. It is shown that the water plant erected by the Land Company was sold to the Park Place Water & Light Company in August, 1913. The contract of sale recites the consideration as being $10,500 cash paid by the Water & Light Company, and the execution of one note for $4,000, and, as a further consideration, it was agreed between the seller and purchaser that for the period of 10 years from the date of the contract the Water & Light Company should furnish water and light to all people residing in Park Place, as then subdivided and in further sub-

divisions thereof, who may desire to use water or light, at stipulated rates, and that extensions should be made as required for that purpose. The Land Company, on its part, agreed that for said term it would advance money to the Water & Light Company as the same should be required in extending and repairing water mains, poles, wires, and for installing meters, and for such other uses as might be required by the Water & Light Company in operating and conducting its business as such Water, Light & Power Company. Both parties to said contract performed their obligations thereunder for the term of 10 years, and said contract had at the time of the filing of this suit expired and the same was no longer in force and effect.

It is shown that the revenues or earnings of the Water & Light Company are now, and have been for some time, sufficient to pay its operating expenses and for necessary repairs and extensions, notwithstanding it is now using but little more than half of its capacity.

It is shown that no one has extended credit to the Water & Light Company except the Land Company, and that the Water & Light Company is now indebted to the Land Company in the sum of $37,000, and that, to secure the payment of said sum, the Land Company has a lien on all the property of the Water & Light Company.

[5-7] By its fifth counter proposition appellee submits the following contentions:

"To require a waterworks company to extend its service beyond the territory which it has professed and contracted to serve, when such extensions will eventually require largely increased facilities and capital, will deprive it of its sole source of credit, will render impossible of performance its prior obligation to present and prospective users in its professed territory, and will cause it to go out of business, would be an impairment of the obligation of contract in violation of section 10, article 1, of the Constitution of the United States."

The contentions set forth in the counter proposition cannot be sustained, because (1) to require the connection prayed for by appellant would not compel the Water & Light Company to extend its service beyond the territory which it had professed to serve; (2) the Water & Light Company is under no contract to serve only those residents who reside on property owned or sold by the Land Company; (3) it is shown that appellee has an ample supply of water to furnish the water demanded by appellant without lessening the supply of water of its present customers; (4) appellee should not be permitted to refuse to supply water to those who reside in the territory which it undertook to serve because it anticipates that at some future time a supply of water, beyond its present capacity, may be demanded, nor can it be permitted to violate its legal duty to supply such residents with water upon the ground that it fears that the Land Company, who is a competitor of the owners of the unsold lots in Lum Terrace in the sale of lots, will withdraw its credit to it, and that in such event it would be forced out of business.

It is shown that the town of Park Place is a growing town, and that appellee's water plant, by the use of only a little more than half of its capacity, is on a paying basis; thus it is made to appear that if it is not prevented from using its full capacity to supply the increasing residents of said town through fear of the withdrawal of credit by the Land Company, it may soon be able to pay its debt to the Land Company and at the same time be able, from its earnings or from borrowed funds extended by some one other than the Land Company, to enlarge and maintain its plant. However, we do not think appellee can in any event refuse to supply appellants with water because of its fear of loss of credit by the Land Company.

In speaking of the obligation of a water corporation, the court in the Lumbard v. Stearns Case, supra, held that a water corporation may not furnish some houses and lots and refuse a supply to others, and thus give a value to some lots and deny it to others. And then proceeding, said:

"This would be a plain abuse of their franchise. By accepting the act of incorporation, they undertake to do all the public duties required by it."

Having reached the conclusions that under the undisputed facts shown appellant is entitled to the relief prayed for, and that appellee is wrongfully refusing to give such relief, it becomes our duty to reverse the judgment of the trial court and to here render judgment for appellants, awarding them the relief prayed for, and it is so ordered.

Reversed and rendered.