SAN ANTONIO BAR ASSOCIATION ET AL v.
GUARDIAN ABSTRACT & TITLE COMPANY ET AL.

No. A-5344. Decided April 18, 1956.
Rehearing overruled July 11, 1956.
(291 S.W. 2d Series 697)

8

*Earl P. Hall,* of Austin, *Nelson Scurlock, Rawlings, Sayers, Scurlock & Edison,* of Fort Worth and *Frank M. Rosson,* of San Antonio for petitioners.

The Court of Civil Appeals, after findings that the injunction should issue against the abstract company, erred in reforming the judgment so as to exempt the McQuowns therefrom, and that their relationship to the clients was independent of their connection with the corporation. Grievance Com. v. Coryell, 190 S.W. 2d 130, error refused w.m.; Sewart Abstract Co. v. Judicial Com. of Jefferson County, 131 S.W. 2d 686.

*L. M. Bickett,* of San Antonio, for respondent.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

This suit was one for injunction by our petitioners, representing the organized legal profession of the state, to stop allegedly unauthorized or improper joint conduct of the three respondents-defendant related to the practice of law. These respondents-defendant are Guardian Abstract & Title Company, a private corporation doing a title insurance agency and abstract business in San Antonio, Texas, and two attorneys at law, John and Mary McQuown, who are husband and wife and form the law firm of McQuown and McQuown in San Antonio.

The McQuowns own sixty-seven percent of the stock of the corporate respondent (through a wholly owned corporation called the McQuown Mortgage Company) and comprise two-thirds of its board of three directors, Mary McQuown being its vice-president and a layman, C. G. Tierney, being the other stockholder and director as well as president and general manager, while the law firm is the "general counsel."

The firm has always rather confined its practice to real estate transactions and of late years has had little practice of any kind except services rendered to its mortgage company and the respondent abstract and title company, and except the below-described work for customers of the respondent company, which is the subject matter of this suit. The income from the latter, however, evidently compares favorably with, if it does not exceed, that for legal services rendered the corporate respondent and the mortgage company.

The legal work in question consists largely of the drawing of deeds, notes, mortgages and similar documents in the transactions of purchase and sale or mortgage of real estate between individuals, at least one of whom is insuring through the corporate respondent the title of the land being sold or the mortgage on the same land. The corporate respondent thus is not a party to these sale and mortgage transactions nor has any interest in or connection with them except that, as agent of the actual insurer it sells one or both of the individuals concerned title or mortgage insurance, for which, of course, it collects a premium, including, no doubt, an agency commission. Nevertheless the legal papers in question are prepared in the corporate office by McQuown and McQuown or purported lay agents of the latter (as hereinafter further explained) and the "attorney fees" therefor are collected by the corporation, along with the

insurance premiums, from the individuals concerned, the amounts of these fees being credited to McQuown and McQuown by the corporation, which, at the end of each month, pays the former an amount corresponding to the credits accumulated during that month.

While the annual volume of these fees remitted to McQuown and McQuown sometimes runs as high as about $20,000, and, as stated, is for services rendered to third parties, the annual amount of similar fees so collected and remitted to lawyers other than the McQuowns is relatively insignificant. In other words, whenever the corporate respondent is to sell the insurance on a particular title or mortgage, the McQuowns generally get the legal work in the third-party transaction which gives rise to the purchase of the insurance.

Actually this legal work is handled, in mass production style, by several so-called "scriveners," using legal forms prepared originally by the McQuowns, which they are trained by the latter or by other scriveners to use. These girls are merely stenographers or typists, with salaries corresponding to such a status, receiving their salary checks from McQuown and McQuown, but working largely in the office of the corporate respondent, which immediately adjoins the law firm office, which latter is in turn also the office of the McQuown Mortgage Company. Moreover, there is no little evidence to indicate that these scriveners are about as much under the control of superior lay employees of the corporate respondent as they are under that of the law firm. Their work is not restricted to the legal work, but includes miscellaneous clerical or office work for the corporation. With their efforts and those of the transaction "closers," who are lay employees of the corporate respondent and direct the "scriveners" as to the papers to be prepared, an entire transaction is frequently concluded without the McQuowns themselves seeing either the papers or their third-party "clients" who pay their fees. The same work has gone on even when the McQuowns were out of the city for an extended period. Indeed, in their testimony the McQuowns exhibited a rather extraordinary confusion in their own minds as to whether, for example, the purchaser of the land, for which the corporation was to issue title insurance, and the deed to whom was prepared for a fee as above described, was or was not their "client" or "represented by" them at all, even as they also appeared to be unconscious of any incongruity in the same lawyer acting in

the same transaction both for the purchaser (who paid the corresponding fee) and the vendor (who paid the corresponding fee).

The origin of the legal work above described is evidently the title insurance business of the corporate respondent. The latter maintains contact with the insurance purchasing public more or less as would any commercial enterprise, making use of its acquaintances with the real estate fraternity, sometimes advertising in the newspapers and distributing or keeping available for real estate agents useful gifts with the corporate name on them, such as blotters and printed forms of sales contracts prepared by the McQuowns. In the normal case the real estate agent, who arranges a sale to a purchaser desiring title insurance and willing to insure through the corporate respondent, brings the signed sales contract to the office of the latter, and, without any question or discussion about who is to prepare the deed, note, mortgage or other legal papers, the machinery at the same office goes into operation and eventually, with or without some personal participation of Mr. or Mrs. McQuown, the entire matter is there completed, the purchaser of the land departing with his deed and title policy, the vendor with his cash payment and mortgage or mortgage and mortgage insurance, and the real estate agent with his commission. As before stated, the vast bulk of this legal work goes to the McQuowns alone, and relatively little to lawyers generally, although obviously the former are not the only lawyers in San Antonio with specialized knowledge pertaining to real estate transactions, and are probably less active than some others in such practice with the public generally.

As before indicated, the "closing" is handled by the "closers" of the corporate respondent, who handle the matter of adjustments for proration of taxes, deliver the deed or mortgage and the title or mortgage policy to the purchaser or mortgagee, and collect the premiums for the insurance and the fees for preparation of the legal instruments, crediting the fees to the McQuowns. In the usual case, the fee for preparation of the deed is paid by the vendor and that for the note and mortgage by the purchaser or mortgagor, all three documents being prepared by the same scrivener.

The work of McQuown and McQuown for the corporation itself is rather limited and, while substantially compensated, does not include the important matter of examining the title for purposes of issuance of the title or mortgage insurance, this

being done by a lawyer "title examiner" selected by the actual insurer of the titles and mortgages, for which the respondent corporation issues the policies as agent, and apparently compensated by the respondent corporation or the insuring principal or both. He does not draw any papers of the kind here involved, and is not affiliated with the McQuowns.

Further references to the detailed facts will be found in the opinion of the Court of Civil Appeals, along with a more detailed statement of the trial court's findings. 278 S.W. 2d 613.

The trial judge, sitting without a jury, found in effect that the corporate respondent was practicing law through the McQuowns and others as agents and decreed a permanent injunction against "Guardian Abstract & Title Company, its agents, servants, employees, stockholders, successors and assigns." The vital portion of the judgment is copied in the footnote.[1] The petitioners-plaintiff took no exception to this judgment, but the respondents-defendant appealed to the Court of Civil Appeals, praying among other things, for a modification of the injunction. The appellate court, while otherwise upholding the injunction, modified it "so as not to apply to the defendants John McQuown and Mary McQuown as attorneys when all interested parties requested them to prepare necessary legal instruments to a transaction, * * *." 278 S.W. 2d 613, 620, 621.

The petitioners-plaintiff here complain only of the above-mentioned modification, and the respondents have not sought writ of error from the appellate judgment, so the propriety of the modification is the only question now involved.

---

[1] "It is therefore ORDERED, ADJUDGED, AND DECREED that the Guardian Abstract and Title Company, its agents, servants, employees, stockholders, successors, and assigns, shall be forever enjoined, prohibited, and restrained from preparing, in connection with real estate transactions in which the said defendant title company issues or is obligated to issue its policies of title or mortgage insurance, any legal instruments for execution by persons not employed in its business, and to which the said defendant title company is not a party, and in which the defendant title company neither has nor acquires any interest in the subject matter of the said instrument, other than the writing and issuing of the said policies of title or mortgage insurance. In this connection, legal instruments shall include any instrument pertaining to titles to land, and shall include the following instruments: deeds, notes, mortgages, deeds of trust, mechanic's and materialman's lien contracts, releases, transfers, assignments, subordination agreements, affidavits, contracts of sale, and so-called earnest money contracts, it being the intention of the Court to include herein any and all documents and instruments affecting the title to real estate, whether specifically named or not. It is accordingly ordered that a writ of injunction so issue.

"In connection with this permanent injunction, all relief prayed for by any party, but not herein specifically granted, is in all things denied."

■ The essential terms of the decree previously quoted[1] seem to be directed altogether against "unauthorized" practice, that is, against the practice of law by the respondent corporation, more or less as happened in Hexter Title & Abstract Company v. Grievance Committee, 142 Texas 506, 179 S.W. 2d 946, 157 A.L.R. 268. Such an order would conform with the trial court's findings that McQuown and McQuown did, or took part in, the legal work here in question as agents of the corporate respondent, which finding is now no longer open to question by either side. The petitioners did, indeed, specially charge in their pleadings that the McQuowns were guilty of unethical (as distinguished from unauthorized) practice for allegedly violating Canon No. 43 of the Canons of Ethics, which forbids attorneys to permit their professional services or names "to be used in aid of, or to make possible, the practice of law by any person not a member of the State Bar;" and petitioners expressly prayed in separate paragraphs for an injunction to be directed against the McQuowns by name; but in the light of the findings and decree as written, we think the petitioners correctly state in their reply to F. L. Kuykendall, Esquire, *amicus curiae*, that "The McQuowns are enjoined in this lawsuit only in so far as they are agents of the corporation and act as its agents."

Actually, the decretal words, "its agents, servants, employees, stockholders, successors and assigns," following the name of the corporation, with the exception of the single word "stockholders," might well have been supplied by law, even if not expressly stated. Rule 683, Tex. Rules Civ. Proc., provides that an injunction is "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." See also Article 4661, Vernon's Tex. Civ. Stats., now superseded by the Rules. The corresponding language in the statute is the same as that of the Rule except that the word "only" does not occur. No doubt one of the reasons for both the statute and rule is that a corporation can only act through human agents of one kind or another, who are accordingly warned that they will be subject to contempt proceedings in a proper case, although the injunctive order itself might mention only the corporation. Thus the argument of the respondents that injunction is not an appropriate remedy against unethical conduct of a lawyer is properly said by the petitioners to be largely beside the point at the present stage of the case, since we are not now dealing with an attempted injunction against "unethical" practice but with an actual one against "unauthor-

ized" practice (corporate law practice) which is no longer subject to attack except as related to the matter of the modification made by the Court of Civil Appeals. To say that, where a corporation is practicing law through a lawyer as its agent, an injunction against the corporation cannot bind the lawyer would be, for all practical purposes, to defeat the holding in the Hexter Title & Abstract Co., case, supra, since there could be no enforcement of the order against an individual primarily, or at least greatly, responsible for the wrongful conduct of the enjoined corporation. A lawyer may thus be considered and treated as occupying the dual position of attorney and law-practice-agent, even though he may violate the canons of ethics in so doing.

■ To just what particular facts or small group of facts the trial court gave most weight in determining that the corporate respondent was practicing law, through the McQuowns, we are unable to say from the record. Doubtless no single one—not the bare matter of ownership and control of the corporate respondent by the lawyers; nor the physical propinquity of the business and law offices; nor the fact that some of the so-called "conveyancers," or lay employees, paid by the lawyers, but performing a professional type of service, did their work in the corporate office under the direction of purely corporate executives, nor the fact that the corporation actually collected the "attorney fees" for the legal work in question (periodically remitting them to the McQuowns); nor the fact that the McQuowns frequently never saw their third-party "clients;" nor the fact that almost the entire third-party legal work for insurance customers of the corporate respondent went to the McQuowns instead of going to lawyers generally; nor the fact that the McQuowns had little law practice for the public unless it was this particular work, would necessarily determine the matter. What constitutes the practice of law by a corporation, which is intimately affiliated with lawyers but of which the actual primary activity is selling abstracts and title insurance, is necessarily a rather vague and complicated question, which will depend largely on the various facts of the particular case, taken together. The basic matter is the character or method of the combined operation, the result of which in the instant case was that, as the trial court put it, the McQuowns, while ostensibly drawing a deed for a third-party "client" (or permitting their lay "scriveners" to fill in one of their printed forms in the office of the corporation) were in reality acting as agents for the corporation—thinking of themselves as primarily working

for it, and as they themselves largely admitted, *not* thinking of themselves as "representing" the individual "clients" concerned.

Now, when an injunction issues in such a case, how far must the court go in spelling out for the guidance of the attorney-agents what is *not* enjoined?—in specifying what future arrangements they may make with their title and abstract company concerning the handling of the transactions in question, which will be the proper practice of law by themselves and not the enjoined corporate practice of law through them as agents?

■ We have, indeed, said "* * * that an injunction decree must be as definite, clear and precise as possible and *when practicable* it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." Villalobos v. Holguin, 146 Texas 474, 208 S.W. 2d 871, 875 (emphasis supplied). But obviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written. And obviously, too, the decree cannot prejudge new situations, which were not before the court in the first instance, whether prejudging them as nonviolations or violations of its general terms. Nor should it be greatly concerned with rights of the defendants that are asserted largely in the abstract. Otherwise it would probably take longer to write the decree than it would to try the case, and the injunction might well become unintelligible and self-destructive.

In North East Texas Motor Lines v. Dickson, 148 Texas 35, 219 S.W. 2d 795, 11 A.L.R. 2d 1065, we said, in effect, that a general injunction against picketing the plaintiff's place of business necessarily meant, not all picketing, but only of the kind, or under the circumstances, which the enjoining court had held to be illegal in determining whether the injunction should issue in the first place. We accordingly did not modify the injunctive order. Similarly, in the instant case the injunction cannot be understood as enjoining the respondent lawyers from engaging in any lawful form of law practice. It does, in effect, enjoin them from taking part in the corporate practice of law by the respondent corporation, its successors or assigns. If what they may do in future is not taking part as agents of

the corporation in such corporate practice of law, they will not have violated the injunction. But the court cannot attempt to spell out for the future how they may or may not escape the terms of the order by varying this or that part of a whole system of long standing that now operates to make them agents in corporate law practice as regards certain transactions, nor deal with rights in the abstract.

Conceivably, as suggested for the respondents, if the lawyer respondents should divorce themselves of all except a very small interest in the corporate respondent, we *might* have a different result, because the trial court might thus more reasonably find that the lawyers were not working for the corporation in their ostensible work for third parties. But this would depend on all the other circumstances prevailing at the time. Certainly there *can* be corporate practice of law, and with participation of licensed lawyers, even though the lawyers have no proprietary interest in the corporation in question.

Conceivably, too, there might arise particular instances where these lawyer respondents, even with their present ownership and control of the corporation, may be able to handle legal transactions of the kind here in question without being or becoming agents; but again that would depend on the circumstances.

To declare in rather general terms, as did the Court of Civil Appeals, that the injunction shall be inoperative whenever the third parties in question "request" these lawyers to perform the services, would open the door to easy evasion of the order. At least for all practical purposes, such a modification might well protect the respondents where the "request" is not genuine, but actually responds to the suggestion of a title insurance salesman or is otherwise influenced by the corporation. A whole system of operation built up over the years is hardly to be varied in its true consequences by some overnight change of this or that single feature or formality of it. If the intimate association now existing between the lawyers and the business corporation be continued in substantially its present form, it would be not at all unlikely for nongenuine "requests" to be made, and this would probably happen in such a way that the vice in the request would be difficult of both detection and proof. Are we, for example, to prejudge *now* instances such as where the legal work comes to the McQuowns as a result of the "clients" telling the real estate agents or employees of the corporation, "You put down the name of some lawyer here in the

company, and that's the one I request."? Actually it appears that the corporation was providing real estate agents or other persons with sales contract forms, including appropriate words and blanks for the parties to the contract to "designate" a particular attorney or firm; and yet the court found the corporate practice of law to exist, evidently attaching little importance to this attempt to regularize an otherwise irregular course of conduct.

Nor do we see anything in the record indicating that a significant number of the third-party clients, who were also customers of the corporation, have ever requested or might spontaneously request the legal services of the respondent attorneys —without suggestion or influence emanating from the corporation. Especially considering the apparent admissions in the record that both McQuowns are on the verge of retirement so far as their individual work for the public is concerned, it seems unlikely that any significant part of the work here in question would come to them by request of the "client," unless the request were in turn due to their affiliation with the corporation. If it *were* so due, it would be more in the nature of a consent or acquiescence than a request, and there would accordingly be a serious question as to whether the "request" could be taken as destroying the corporate agent status the McQuowns now occupy. If it were *not* so due, it would doubtless be so occasional as not to justify the risk of impairing the proper effect of the injunction by modifications.

We could, of course, attempt ourselves to make a proper modification of the modification made by the Court of Civil Appeals. But if we go that route we inevitably end either by prejudging future situations or by crippling the proper effect of the decree—and this in order to protect an interest that seems quite possibly academic.

These latter risks we do not feel disposed to take after weighing them in the balance with other factors, including the claimed rights of the respondents that are urged as requiring a modification. The interests of the public are involved and are safeguarded by the decree. The respondents are in default to the public and have evidently profited by that default over the years. Two of them are lawyers and must, or should, have known that they were "skating on thin ice" since the beginning. As indicated, we see good reason to doubt that any proper modification of the decree which might be devised could be of much practical value to them. No injunction decree will ever be per-

fectly just to both sides. In this case we consider it best to leave it as the trial court entered it, so that, if the respondents wish to pursue in future a somewhat similar course to what they have followed in the past, they will have the burden of justifying alleged new situations as they arise, rather than, by a purported modification, forcing the petitioners to carry all over again the burden they have carried for the public and the profession up to this point.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

Opinion delivered April 18, 1956.

MR. JUSTICE GRIFFIN joined by JUSTICES SMITH, CULVER and CALVERT, dissenting.

I cannot agree with the majority opinion in this case.

I would affirm the judgment of the Court of Civil Appeals and in addition delete from the trial court's judgment the word "stockholders" so that a stockholder would not be enjoined in this cause. I can see no reason why the stockholder who happens to be a lawyer should not engage in the legitimate practice of the law in preparation of the instrument in which this corporation might be interested.

Opinion delivered April 18, 1956.

Rehearing overruled July 11, 1956.