INVERNESS FOREST IMPROVEMENT
DISTRICT et al., Appellants,

v.

HARDY STREET INVESTORS et
al., Appellees.

No. 16700.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

July 22, 1976.

Rehearing Denied Sept. 30, 1976.

Butler, Binion, Rice, Cook & Knapp, Tom P. Alexander, Robert M. Hardy, Jr., Houston, for appellants.

Sears & Burns, Will Sears, C. Charles Dippel, Houston, for appellees.

COLEMAN, Chief Justice.

This is an appeal from a judgment awarding mandatory relief and permanent mandatory and prohibitory injunctions which, in effect, ordered the defendants to construct specific utility improvements to appellees' land, and in connection therewith to sell certain authorized and unissued utility bonds of the improvement district for use in financing such construction.

The case was tried to a jury and in answer to the only special issue submitted, the jury found that the district had acted arbi-

trarily in failing to provide utility services to appellees' land. The judgment will be reversed and the cause remanded.

Hardy Street Investors and Kingsbridge Development Corporation, the plaintiffs in the trial court, each owned a tract of land located within Inverness Forest Improvement District, a municipal corporation created by statute. The two tracts of land combined contain 65 acres. The improvement district together with its directors were the defendants in the trial court. The plaintiffs sued to require the improvement district to extend water, sewer, and drainage facilities to the land located within the district which they owned. The plaintiffs alleged that the district had discriminated against them in refusing to install utility lines and drainage facilities in and on the land owned by them when bonds for that specific purpose had been voted and were available at the time service was requested.

The district presents in this court points of error asserting that the finding made by the jury together with the undisputed facts do not authorize the specific relief granted by the trial court. The district asserts that the trial court lacked the authority to compel the district by writ of mandamus to sell its bonds and construct specific improvements because such matters are within the discretionary powers of the district.

■ By preliminary motion the landowners have moved to dismiss this appeal because the notice of appeal failed to name a specific court of civil appeals, there being two courts of civil appeals having concurrent jurisdiction of the appeal. This point cannot be sustained. *Texas State Board of Pharmacy et al. v. Gibson Discount Centers, Inc., et al.,* 539 S.W.2d 141 (Tex.1976).

■ The appellees further argue that this appeal should be dismissed because the appellants merely gave notice of an intent to appeal in the future rather than giving "present notice." The defendants filed in the trial court under a proper style and number the following instrument:

"COME NOW INVERNESS FOREST IMPROVEMENT DISTRICT, . . .

and respectfully give notice of their intent to appeal to the Court of Civil Appeals the Final Judgment of this Court."

Rule 353, Vernon's Annotated Rules of Civil Procedure, in paragraph (b) provides: "Such notice, when filed the clerk (sic), shall be sufficient if it state the number and style of the case, the court in which pending, and that appellant desires to appeal from the judgment or from some designated portion thereof."

The notice of appeal filed by the defendants complies with Rule 353, supra, in that it gives notice of their present intention to appeal. A judgment had been entered, and the defendants' motion for new trial had been overruled at the time the notice of appeal was filed. These facts distinguish this case from the case of *Yancy v. Wolfe,* 523 S.W.2d 516 (Tex.Civ.App.—Ft. Worth 1975, writ ref'd n. r. e.). The wording of the notice substantially complies with the rule. *Calame v. Prudential Ins. Co. of America,* 423 S.W.2d 940 (Tex.Civ.App.—Waco 1968, no writ history).

Inverness Forest Improvement District was created by act of the 59th Legislature, which has been codified as Article 8280–325, and came into existence June 17, 1965. It is located within Harris County and contains 473 acres of land. The district is located in northern Harris County. Approximately 261 acres are located south of Cypress Creek and west of Hardy Street Road. This area is known as Inverness Forest Subdivision. The rest of the district is situated north of Cypress Creek and east of Hardy Street Road. The plaintiffs, Hardy Street Investors, and Kingsbridge Development Corporation, together own approximately 65 acres of land within the tract located south of Cypress Creek. Practically all of the remaining acreage in the land south of Cypress Creek has been fully developed.

At the first meeting of the board of directors of the district in 1965 the district adopted a detailed plan of improvements and called for a bond election in the amount of 1.7 million dollars. The bond election carried and the district issued 5% bonds in

the amount of $750,000.00 in September 1965. The district secured from the Texas Water Pollution Control Board a permit to discharge into Cypress Creek a volume of treated sewage (not to exceed an average of 400,000 gallons per day). The permit contained a clause requiring the district to go to regional or area-wide system treatment plants if same were established in the future. Thereafter some $600,000.00 worth of the issued bonds were sold and water, sewer, and drainage lines were constructed in Sections 1 through 3 of Inverness Forest Subdivision, and a water and sewer treatment plant for the district was constructed.

In 1967 the district found that it could not market the 5% bonds and called a second bond election authorizing the issuance of 1.35 million dollars in 6% bonds. This bond election passed and $570,000.00 worth of the bonds were ordered issued in 1967. $300,000.00 of the issued bonds were sold in February 1968 and an additional $250,000.00 worth were sold in January 1969. These funds were used for completing service in Sections 2 and 3 of Inverness Forest and for installing water, sanitary sewer, and drainage improvements in Section 4 of the Inverness Forest.

In 1969 it was determined that 6% bonds were unmarketable and a new bond election was called, but the election failed to carry. The minutes of the district reflect that all of these bond elections were predicated on the original plan of improvements adopted in 1965.

The witness, Coulson, who was the district engineer in 1969, testified that after the defeat of the third bond issue he was requested by the district to prepare a new plan of improvements for the next proposed bond election. He testified that he prepared plans for the improvement of the entire remainder of the district including the part east of Hardy Street Road, and an estimate of the construction costs and incidental bond costs associated with the improvements plan. At a meeting of the board of directors of the district held on December 23, 1969, Coulson presented the new plan of improvements and his estimate to the board. The minutes of this meeting recite:

"There were submitted to the meeting engineering plans, specifications, surveys, maps, drawings and explanatory data for the construction of extensions and additions to the district's existing water and sewer system and drainage system adequate to service the area of the district. Accompanying said plans were the engineer's report, the engineer's estimate of the cost of said extensions and additions, . . . and full information on the program contemplated. Said plans and other items submitted were examined and fully considered by the board, after which it was duly moved, seconded and unanimously carried . . . that said plans and items be adopted and approved in their entirety without changes therein, and that the same be filed in the office of the district and be and remain open to public inspection."

The minutes continued with a summary of the engineer's estimates as contained in the report of cost of said extensions and additions to the district's improvements. The minutes also reflect that a motion was unanimously carried authorizing a bond election to be held on February 14, 1970, for the authorization of $780,000.00 construction bonds, and directing the president and secretary of the board to publish a notice of said election as provided by law. The minutes reflect that both the order calling the election and the notice of the election recite that "the plan of improvements is on file" in the office of the district and open to inspection. The evidence reflects that thirty-one days prior to the election the district's directors discussed an explanatory letter to be sent to all residents of the district in connection with the bond election. The letter was introduced into evidence dated January 23, 1970, authored by one of the directors of the district, and signed by all directors. The evidence reflects that this letter was mailed to all residences in the district.

This letter reads:

"                    January 23, 1970

"Dear Residents:

"Inverness Forest Improvement District now operates with only one water well and a sewage disposal plant which has just about reached maximum capacity. In order to drill and complete another water well to assure service if the present one should fail; to erect a high rise water tower to provide adequate reserves and pressure if the pumps fail; enlarge the sewage plant to avoid backups; construct water and sewage trunk lines to serve the undeveloped sections of Inverness Forest Subdivision, the District must sell bonds which you previously approved for this purpose.

"The water, sewage disposal and drainage facilities provided for you by the Inverness Forest Improvement District are paid for by a combination of water and sewer service revenue and an annual property tax. The new connections that can be served by the completion of these facilities will add to the District's taxable property thus benefitting all Inverness Forest owners.

"Because of the increased cost of money for all purposes, your Directors ask your approval to adjust the interest rate on the remaining unsold bonds in accordance with allowable rates recently authorized by the Texas State Legislature and the City of Houston. An election for this purpose will be held at the Inverness Forest Sales Office on February 14.

"If you have questions concerning this proposal, please feel free to write or call any of us. We urge the approval of the proposal to be voted on February 14.

                    Sincerely,         "

The voters of the district approved the proposal for the issuance of bonds as submitted to them in the February 1970 bond election. Coulson testified that he then completed the detailed construction plans and specifications for the water, sewer and drainage lines, an additional water plant, and a 3,000 population addition to the sewage treatment plant to serve the undeveloped 65 acre tract of the Inverness Forest Subdivision. Coulson testified that he advertised for bids upon such plans, and they were received from contractors on July 6, 1970. He transmitted the bids along with his recommendation to the district on July 29, 1970. He testified that the lowest and best bid of four contractors for all water, sanitary sewer and drainage improvements was the sum of $420,279.00 which was $79,521.00 less than the estimated cost.

The construction bids received by Coulson came up for action before the directors on August 6, 1970. In the minutes of that meeting the following statements appear:

"It appeared that the engineer for the District had heretofore taken bids for the next phase of water, sewer and drainage construction with the District. No authority for such action was ever granted by the Board. . . . It was further brought to the Board's attention that the current plans of the developer differed from the original preliminary plans drawn by the District Engineer for development within the District in that apartment construction was now contemplated, whereas only single family residential construction had been originally contemplated. . . ."

Following some discussion it was resolved by the board that the consideration of the taking of bids for the construction contracts be tabled. Coulson testified that he was authorized to advertise for construction bids by the district's attorney. Coulson was never asked by the district to re-bid the plans. He ceased to be the district engineer on September 22, 1971.

Coulson testified that he submitted a set of plans for improvements to the two tracts of land belonging to the plaintiffs to the board of directors at the December 23, 1969, meeting. This plan was introduced into evidence as Plaintiffs' Exhibit # 227. This plat shows the various streets, the location of a proposed water plant, a proposed sewage pump station, proposed water and sewer lines as well as existing streets, water lines and sewer lines adjacent to and within the property. Various areas depicted on the plat are labeled "Reserve", and "Apart-

ments." The plaintiffs contend that Exhibit 227 is a copy of the plan adopted by the board at the December 23, 1969 meeting and that this fact is established in the evidence as a matter of law. However, Mr. Volbrecht, a director from 1968 to 1974, testified that Px 227 was not the set of plans presented at the August 6, 1970, meeting and that prior to August 1970 he had never seen any plans that resembled Px 227 and that he had not seen any plans that included apartments. He testified that neither Px 227 nor any plans substantially similar to Px 227 were submitted to the board on December 23, 1969, but that he could not identify what plans were submitted. There is evidence that the board did not maintain a record known as "Engineer's Report" as required by the Texas Water Code. Neither did the district maintain a record known as "Engineer's Record" as required by the Code. The district failed to produce the plan of improvements adopted at the December 1970 meeting of the directors of the district. A series of dates preceded by the letter "R" appears on Px 227. There is testimony that these dates reflect the instances on which revisions of the plat were made. There is evidence that these revisions were minor. Nevertheless it affirmatively appears that the plat introduced into evidence as Px 227 is not identical to the plat which was on file in the office of the district at the time of the election. There is also evidence that the plans filed by the district engineer three days prior to the directors' meeting depicted the plan for improvement of the remainder of the district including property other than that owned by the plaintiffs. The estimate of costs filed by the engineer included the cost of the improvement of the entire district. The summary of the cost of improvements found in the district's minutes is a lesser amount than the estimate and may reflect a decision of the board to improve only the property belonging to plaintiffs. There is no evidence that this decision was made known to the voters in such a readily understandable form as to form the basis of a contract with them.

The minutes of the August 6 meeting establish that a plan for the improvement of the entire district was approved. This included "engineering plans, specifications, surveys, maps, drawings and explanatory data for the construction of extensions and additions to the District's existing water and sewer system and drainage system adequate to service the area of the District."

These minutes constitute evidence that several maps were on file as part of the plan for improving the district. If Px 227 is a copy of one of these maps, there is nothing to show that the voters at the election relied on that map, and the plan of improvement shown thereon, as being the only area to be improved with the proceeds of the proposed bonds.

The evidence does not establish that Px 227 was part of the plan for improvements on file in the district's office on the date of the 1970 bond election. It raised a fact issue only. The trial court erred in ordering the district "to provide the specific services required by the district's comprehensive plan of improvements for the subject property set out and described in paragraphs 4 and 11 above of Plaintiffs' Second Amended Original Petition which paragraphs are herein incorporated by reference as part of this judgment."

On January 23, 1970, as shown by the letter previously quoted, the directors of the improvement district represented to the voters that if they approved the bond propositions to be submitted on February 14, 1970, the district would drill and complete an additional water well, erect a high rise water tower, enlarge the sewage plant, and construct water and sewage trunk lines to serve the undeveloped sections of Inverness Forest Subdivision. The evidence reflects that the voters generally had notice that the judgment and discretion of the board had already been exercised in respect to these improvements.

■ Since a regional waste disposal system is in operation in the area of the district, it appears that the district can no longer use the excess capacity granted by their waste disposal permit. Conditions

have so changed that the district cannot now carry out its agreement with the voters to enlarge the existing sewage plant. It does not follow, however, that the district cannot furnish sewer service to the remaining lands of the district. The district cannot be compelled to sell the 1970 bonds for the purpose of enlarging the sewer plant, although the directors in their discretion might devise a plan by which part of the bond proceeds could be used legally to furnish sewer service to the remaining lands of the district. The evidence establishes that the unissued 1970 bonds are insufficient in value to pay for the improvements promised the residents of the district by the letter of January 23, 1970. There is no contention, however, that the conditions have so materially changed since the bonds were voted that the improvements here involved would be an unwise and unnecessary expenditure of public funds. The improvements desired will require that additional funds be made available. The method by which the necessary funds are raised is within the discretion of the directors of the district.

■ The proceeds of bonds voted by the people must be expended for the purposes for which they were voted. Where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully. If such governing body acts illegally, unreasonably, or arbitrarily, a court of competent jurisdiction may so adjudge, but there the power of the court ends. *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975 (1936).

■ The order calling the bond election in question specified the purpose of the election was to authorize the issuance of bonds "for the purpose of purchasing and constructing extensions and additions to the system's existing water and sanitary sewer system and drainage system." Both the order calling the election and the notice of the election recite that the "plan of improvements is on file" in the office of the district and open to inspection. The letter of January 23, while not shown to be offi-

cial action of the board, must be considered as accurately reflecting portions of the plan of improvements on file in the district's office. The voters of the district authorized such bonds to be issued in reliance on the plan of improvements and the directors' letter representing that certain improvements would be made and showing the necessity for same. The letter had the effect of representing and pledging to the voters that the judgment and discretion of the board had already been exercised by naming these particular projects as projects to which part of the proceeds of these bonds would be appropriated. The directors of the district cannot arbitrarily ignore or repudiate their pledge. *Hudson v. San Antonio Independent School District,* 127 Tex. 517, 95 S.W.2d 673 (1936).

■ There is evidence that projects other than those mentioned in the letter were included in the plan. The judgment of the trial court ordered the bonds to be issued and sold and the proceeds applied to the cost of constructing certain named improvements. The district was permanently enjoined from using the proceeds of the bonds authorized by the 1970 election for any purposes or improvements other than the improvements set out in paragraph 11 of the Plaintiffs' Second Amended Petition. In this paragraph is set out the location of proposed water and sewer lines, as well as storm sewer and drainage lines. The paragraph also refers to the "construction or causing to be constructed additional sewage treatment facilities (or enlargements to existing facilities) adequate to treat the sewage and waste generated by a population of 3,000 people."

The letter of January 23 did not refer to storm sewers or drainage lines. It did not refer to the location of proposed improvements or the size of the proposed enlargement of the sewer treatment plant. The representations made to the voters in the letter did not affect or in any manner control the discretion of the governing board of the district with regard to these matters. This is a jury case. The trial court lacked authority to make a finding of fact deter-

mining the specific content of the plan of improvement adopted by the district. A jury issue was raised by the evidence. Under these circumstances the trial court erred in issuing the permanent injunction, and the order requiring the proceeds of the bonds applied to the specific projects referred to in the judgment.

There is evidence that the bonds are saleable, and that other sources of revenue are available to the district. There is also evidence that because of the increased value of the property to be improved, and because of the increased water use fees to be derived from the sale of water to the residents of the property to be developed, the extension of utility service to the area would not be unduly burdensome to the district. The district is under a duty to serve the public without discrimination. *City of San Antonio v. Texas Water Commission,* 407 S.W.2d 752, 768 (Tex.1966). The district has not attacked the jury finding that the district arbitrarily and capriciously failed and refused to extend water, sewer and drainage service to the land owned by the plaintiffs.

■ The district was created by an act of the legislature codified as Article 8280–325, V.A.C.S. Section 17 of the act granted the district the authority to purchase and construct, or otherwise acquire water works systems, sanitary sewer systems, storm sewer systems and drainage facilities or parts of such systems or facilities. It is a political subdivision of the State, and its function is to furnish these services to the land forming the district. The district adopted a general plan for the furnishing of such services to all of the lands within the district. Since it has undertaken to supply such services, it is obligated to supply them to all of the landowners within the district without discrimination. *Allen v. Park Place Water, Light & Power Company,* 266 S.W. 219 (Tex.Civ.App.—Galveston, 1924, error ref'd).

■ The finding of discrimination made by the jury, together with the undisputed facts established in the evidence, are sufficient to require the trial court to issue its writ of mandamus, or mandatory injunc-tion, compelling the district to make available the requested utility services to the lands owned by the plaintiffs. *City of Galveston v. Kenner,* 111 Tex. 484, 240 S.W. 894 (1922); *Allen v. Park Place Water, Light & Power Company,* supra.

■ The district contends that the trial court erred in excluding the testimony of the tax assessor and collector of the water district which would have established that the plaintiffs refused to pay taxes on their real estate from the year 1972 to the date of trial. The district asserts that this evidence was admissible as tending to explain the failure of the district to extend services to the land owned by the plaintiffs. They contend that the evidence was relevant on the issue of whether or not the water district acted arbitrarily and capriciously in failing to furnish utility service to such land. The district has not complained on appeal of the instructions given by the trial court with reference to the special issues submitted. The trial court instructed the jury that unreasonable discrimination by the district against the subject property whether accomplished by failure to act or by refusal to act constituted arbitrary and capricious action. By this instruction the jury was instructed to concentrate its attention on the question of unreasonable discrimination.

The district contends that the failure to pay taxes on part of the plaintiffs is a good and sufficient reason for the district to refuse to extend utility services to the property belonging to the plaintiffs. It contends that provisions of the Texas Water Code authorize the district to discontinue services to patrons who fail to pay real estate taxes. Texas Water Code, Sec. 51.-338, permits a district to discontinue a service to enforce payment of "specific charges, fees, or rentals in addition to taxes." While it is not clear whether this provision of the Code authorizes a district to *discontinue* the service to enforce payment of taxes, it does not specifically authorize the district to refuse to make services available in accordance with a plan adopted by the district. The question under this provision of the

Code would arise when the plaintiffs made application to tap onto the water or sewer lines. The service cannot be discontinued since it has never been established.

Sections 51.311 and 51.321 are cited by the district, but these sections are contained in Subchapter g of the Water Code which is speaking to irrigation services and are not applicable to the questions which arise in this case. Section 51.587 of the Water Code is the section clearly applicable to this situation. This section allows the district to file suit to collect back taxes, and to sell the property under judgment of the court. No provision of the Water Code authorizes the district to refuse to proceed with the plan of improvement on the faith of which the voters of the district authorized the issuance of the bonds. The trial court did not err in refusing to admit the testimony.

The evidence establishes without dispute that the district proposes to issue a portion of the 1970 bonds to finance proposed improvements to the existing drainage system in an area outside of the undeveloped sections of Inverness Forest Subdivision. The evidence does not establish the exact plan on file in the office of the district at the time the 1970 bond election was held. The proposition voted on at that time is sufficiently broad to authorize use of the proceeds of the bond election for drainage projects. While the evidence shows that the authorized but unissued bonds will not be sufficient to fully finance the improvements shown on Px 227, the evidence does not establish the inability of the district to finance the improvements required to service the plaintiffs' property and the desired improvement to the drainage system, when all the resources available to the district for financing are considered. The plaintiffs have failed to establish that the bonds were authorized for the particular purposes alleged, and that the district threatens to use the proceeds from such bonds for a purpose other than that for which they were originally authorized. The trial court erred in enjoining the use of the proceeds of the 1970 bonds for the Hardy Street drainage project. *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975 (1936).

The district was under a duty to furnish water, waste disposal and drainage facilities to all requesting these services within the perimeters of the district without discrimination. It is also under a duty to use the proceeds of the bonds authorized by the 1970 elections to implement the plan for improvements which the directors of the district represented to the voters they had adopted. The district has no duty to sell its authorized bonds if other methods of financing can be provided. The trial court was authorized to require the district to provide utility services to the plaintiffs' land. However, the trial court erred by ordering the district to sell all its authorized and unissued bonds, by ordering the district to construct the improvements described in paragraph 11 of Plaintiffs' Second Amended Petition, and by enjoining the use of proceeds of the 1970 bond issue for use in constructing improvements on the Hardy Street drainage ditch.

The judgment is reversed and the cause is remanded to the trial court.

## ON MOTION FOR REHEARING

The plaintiffs have complained that we erred in our disposition of this case in that we failed to affirm the judgment of the trial court insofar as it required the District to make available the requested utility services to the subject property. For the reasons stated in our original opinion we conclude that the plaintiffs were entitled to an injunction requiring the District to make available to the lands owned by the plaintiffs the utility services which they have previously requested.

The plaintiffs also allege that the Water District's 1970 utility bonds had been authorized for the sole purpose of implementing a certain specific plan of improvements detailed in Plaintiffs' Exhibit No. 227. They sought injunctive relief to prevent these bonds from being used on any project other than that described on Px 227 and also for a mandatory injunction to compel the Water District to sell the bonds and

implement Px 227. We consider these issues to be separate and severable from the issue of arbitrary refusal to extend services to the lands owned by the plaintiffs. The plaintiffs failed to request issues establishing that the voters adopted the bond issue in question in reliance on representations made by the District that the bond proceeds would be used by the District to construct the improvements as reflected by Plaintiffs' Exhibit 227. As a result plaintiffs waived any recovery based on this theory. Rule 279, Texas Rules of Civil Procedure; *Glen Falls Insurance Co. v. Peters,* 386 S.W.2d 529 (Tex.1965).

Nevertheless, the trial court has broad discretion in fashioning the relief to which the plaintiffs are entitled by reason of the jury's finding that the District had discriminated against the plaintiffs in making available utility services. The trial court had discretionary power to enter a decree which would effectively prevent this practice. We quote from *Wesware, Inc. v. State,* 488 S.W.2d 844 (Tex.Civ.App.—Austin 1972, no writ history):

"As the Supreme Court held in *San Antonio Bar Association v. Guardian Abstract & Title Company* [156 Tex. 7], 291 S.W.2d 697 (1956), the injunction decree must be as definite, clear and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for a further hearing. But obviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped. It should not be greatly concerned with rights of the defendant which are asserted largely in the abstract . . ."

The evidence clearly shows that the bond funds available to the District are not sufficient to provide adequate water, sewer and drainage to serve the property belonging to the plaintiffs. There is evidence that other methods of financing are available to the District, but that the District is reluctant to implement alternative plans for financing the needed improvements. The trial court erred in enjoining the use of bond funds on any project other than that described on PX 227, but it properly could have enjoined the use of these funds until such time as a plan had been adopted and implemented to end the discriminatory practices. *Miers v. Brouse,* 153 Tex. 511, 271 S.W.2d 419 (1954).

The motion for rehearing is granted in part and in part overruled. The cause is reversed and remanded to the trial court with instructions to enter a decree requiring the District to cease its discriminatory practices and to proceed to make available to the property owned by Hardy Street Investors and Kingsbridge Development Corporation located within said District water and sewer disposal and drainage services upon the terms previously granted to other property owners within the District.