V. W. FROST et al., Appellants,

v.

SUN OIL COMPANY (DELAWARE),
Appellee.

No. 16950.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Dec. 1, 1977.

Rehearing Denied Dec. 29, 1977.

Vinson & Elkins, Raybourne Thompson, Sr., Houston, Taylor & Norwood, E. R. Norwood, Liberty, John A. Sieger, D. Bruce Pope, Houston, for appellants.

McGinnis, Lochridge & Kilgore, Robert C. McGinnis, George D. Byfield, David L. Orr, Austin, for appellee.

PEDEN, Justice.

Sun Oil Company sued Texaco and Vernon W. Frost and other intervenors (Frosts) for a declaration of rights under the parties' water pressure maintenance agreements. Sun also sought to enjoin Texaco from ceasing to inject water into the Fig Ridge (Seabreeze) Oil Field in accordance with the parties' earlier agreements. The trial court decided that two of the parties' agreements were ambiguous and submitted two issues to a jury, which found that 1) upon termination of their 1974 agreement the parties mutually intended to revert to the rates of water injection that existed just before execution of that agreement, and 2) the parties to the 1968 letter agreement mutually intended that it set rates of water injection at the capacity of the injection wells to take water, with a restriction that only 25% of such water be injected into Well No. 2. The trial court ordered Texaco, as new operator of the parties' pressure maintenance program, to inject water at the pre-1974 rates, ordered Texaco and the Frosts to reimburse Sun for their respective shares of its expenses for the program's operation prior to judgment, and ordered that no party modify the program without prior approval of the Texas Railroad Commission.

In their appeal from this judgment, Texaco and the Frosts assert that the agreements were not ambiguous and that ambiguity was not raised by the pleadings. No evidence points and insufficient evidence points are directed to each of the issues submitted. Texaco complains that the court included an erroneous definition of "intent" in the charge and that injunctive relief was improperly allowed. Texaco and Frost both complain about the grant of money damages for Sun's continued operation and assert that the Texas Railroad Commission is without jurisdiction to require continued injection.

Sun Oil Co., Texaco and the Frosts established a joint water pressure maintenance program in 1954 to supplement the natural water drive into the Fig Ridge Field by injecting water into the subsurface. They hoped to maintain enough pressure to force the oil up and produce all the recoverable oil. An operating committee, composed of one member for each party to the agreement, was given authority to determine injection rates and locations. It could exercise its power only by the vote of two or more parties who own at least 75% of the total number of producing wells; this provision gave each of the three major participants an absolute veto power. Paragraph 25 of the 1954 agreement stated: "This agreement shall continue in full force and be effective so long as oil is being produced from said Seabreeze Sand, unless sooner terminated by a vote of the parties owing at least 75% interest in said facilities at time of such termination." Sun was appointed the operator.

Three water injection wells were drilled between 1954 and 1964; all were located on the western perimeter of the field. Sun's leases are on both the eastern and western sides of the field, the Texaco leases are in the north central portion, and the Frosts own the south central part. The field is on an anticline with the down dip to the west and center and the up dip to the east, so Sun had wells on both the bottom and the top of the anticline.

In 1967 Texaco became dissatisfied with the injection rates, especially as to Well No. 2, since the water being pumped into the down dip (western side) forced the oil from the Texaco and Frost leases up to Sun's wells on the eastern side. In resolution of the dispute, the parties adopted the "May 22, 1968 letter agreement," which allowed the drilling of a fourth salt water injection well and provided that well number 2 be restricted to injecting 25% of the total field injection volume.

In 1974 another controversy arose with respect to the water injection rates. As a result of negotiations conducted at meetings of the operating committee in March and April of that year, the parties entered into the May 1, 1974 agreement. It provided that the injection rate would be reduced for a terminable period by limiting it to the quantity of water produced plus the quantity of water required to maintain bonus allowables.

Sun's position is that the termination of the 1974 agreement resulted in a reversion to the pre-1974 rates of injection while the appellants say the termination meant that there were no longer any agreed rates of injection and that all injection should cease until adoption of a new agreement. The provisions as to termination contained in the 1974 agreement were found in its last three paragraphs:

"This agreement shall remain in force and effect until terminated by the parties hereto; provided that on fifteen (15) days advance written notice to the other parties, any party hereto may terminate this agreement at any time on or after December 1, 1974. After such termination, the parties hereto shall no longer be bound by the terms hereto.

"It is understood that this procedure, as set forth in this agreement, is strictly a trial period in order that the parties may observe the results of injection at the aforesaid rates.

"It is understood that this agreement is in compromise and settlement of a dispute between the parties and that after its expiration date none of the parties

hereto shall be bound by any matter contained herein."

While this agreement was in effect, the parties were again trying to work out a unitization agreement, but when those efforts failed, Texaco gave notice of its termination of the 1974 agreement by a letter dated October 10, 1975. Thus the parties allowed the program to be operated under the 1974 agreement for nearly eighteen months, although any of them could have terminated it after seven months. Sun was ordered removed as operator and replaced by Texaco, effective November 1, 1975. Sun filed suit on October 28 for declaratory relief and for an injunction to prohibit Texaco from stopping injection. Texaco filed a counterclaim for a temporary injunction, as did the Frosts, to prevent Sun from operating the program. On July 12, 1976, the Railroad Commission denied Texaco's plea to have injection reduced and ordered injection continued for a 6-month period at a volume necessary to replace the production of oil, water, and gas. Texaco and the Frosts did not pursue their applications for a temporary injunction, and Sun continued to operate to the date of trial, although appellants ceased making payments of proportionate shares to Sun by March, 1976.

The trial which followed resulted in favorable jury findings for Sun on these issues:

### SPECIAL ISSUE NO. ONE

Do you find from a preponderance of the evidence that the parties to the May 1, 1974 agreement (being Plaintiff's Exhibit No. 35) mutually intended that, upon the termination of said agreement, the operator of the Pressure Maintenance Program would revert or go back to the rates of water injection into the Fig Ridge (Seabreeze) Field that existed just prior to the execution of the May 1, 1974 agreement?
ANSWER: We do find that the parties so intended.

### SPECIAL ISSUE NO. TWO

Do you find from a preponderance of the evidence that the parties to the March 22, 1968 Letter Agreement mutually intended that such letter set rates of water injection into the Fig Ridge (Seabreeze) Field at the capacity of those wells to take salt water, with the only restriction being that only twenty-five percent (25%) of such water be injected into Well No. Two?
ANSWER: We find it was their intention.

Several of appellants' points attack as error the submission of the first special issue and the evidentiary support for the first jury finding, alleging that no party pleaded ambiguity, that there was no ambiguity in the 1974 agreement, no evidence to warrant submission of a jury issue as to the parties' intentions, and no agreed rates of injection to be resumed upon termination.

"A contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. . . . In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous." *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

The statements of Texas law which follow are from *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex. 1968). The writing in question was found unambiguous. If there is no ambiguity, the construction of a written instrument is a question of law for the court, and the courts give effect to the intention of the parties as expressed or as is apparent in the writing. It is the objective, not subjective, intent that controls. The parties to an instrument usually intend every clause to have some effect and to evidence their agreement. "Where a question relating to the construction of a contract is presented, as here, we are to take the wording of the instrument, consider the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract."

In our case the quoted paragraphs of the 1974 agreement provide a specific means to terminate its modification of the 1954 agreement; they say that after termination the parties shall not be bound by the terms of the 1974 agreement. Further, that the procedure provided therein "is strictly a trial period in order that the parties may observe the results of injection at the aforesaid rates".

We believe that the 1974 agreement was ambiguous because it was reasonably susceptible to these interpretations:

1. Sun's view is that when the parties trial period had expired they would resume water injection at the last prior rate.

2. The position of Texaco and the Frosts is that on termination of the 1974 agreement there were no agreed rates of water injection.

Parol evidence is admissible to remove the ambiguity, and it has been held that the practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention. *Trinity Universal Insurance Co. v. Ponsford Bros.*, 423 S.W.2d 571 (Tex.1968).

As to the circumstances surrounding execution of the May 1, 1974 agreement, we look to the conclusions which the jury was entitled to reach from the evidence, first reviewing Texaco's position. On May 1, 1974 Texaco and the Frosts were in the process of replacing Sun with Texaco as operator of a changed water injection program. Sun didn't then say that whoever succeeded it would have to maintain the pressure; it proposed a lower rate of injection. That formula would have permanently reduced the rate. Sun thought the reduced rates would damage everyone and would cause the others to accept Sun's views. The words "trial period" are of no help when you consider that although Sun was being fired as operator and was faced with a change in the injection program, it did not say that the injection program couldn't be changed. Sun wasn't then saying that the 1968 contract required injection at capacity. In May of 1974 the parties

didn't understand that they were tied into a program of capacity injection. The turmoil in 1974 was caused by the others' finding out that Sun was injecting so much water.

Texaco argues that Sun puts too much emphasis on the words "trial period". Sun wanted to defer being fired as operator and bringing on Texaco's injection plan, so it found a temporary alternative. But an agreement signed in this context was not intended to resurrect the problem a few months later. Interpreting "trial period" as requiring a post-trial restoration of the 1968 rates would vary the terms of the 1974 agreement in that "1) it would establish agreement on a post-termination matter in contradiction of the parties' agreement that 'after such termination the parties hereto shall no longer be bound by the terms hereto'; and 2) it would require re-opening of a dispute which, the parties agreed, was settled."

The position of the Frosts is next reviewed. In 1954 the field had been producing oil for 13 years, and Sun had enjoyed no natural advantage, but a great migration of oil occurred as a result of the water injection program. Maintenance of pressure to increase ultimate recovery was only one purpose of the 1954 agreement. The other was to protect correlative rights; i. e., to insure to each party an equal right to recover his fair share of the oil and gas beneath his property. Rates of injection affect these rights. Between 1968 and 1974 there were no operator's committee meetings concerning rates of injection. Sun used the 1968 letter as its permission to inject at capacity. The Frosts didn't have a staff of engineers but relied on the operator's reports. In 1974 Texaco's engineers found that Sun's injection rates were causing oil and gas to migrate to the up dip Sun leases. After a heated discussion, Sun proposed that the injection rate be reduced. A motion to remove Sun as operator was tabled so the parties could try to work out their differences. The program is a good one, and the Frosts want it continued, but they want to be treated fairly. After some trading, the parties reached the May 1, 1974

agreement. It was the only time the parties ever agreed on the rate of injection. The Frosts insisted on the provision that the 1974 agreement could be terminated after seven months instead of Sun's proposed one year, because they didn't intend to agree that termination would restore the prior rate of water injection. Pressure maintenance benefits Sun most; higher rates of injection, other things being equal, bring higher migration of oil from the Frost lands and the Texaco leases to the Sun leases. Sun originally had only about 41% or 42% of the oil in place, but will recover about 60% of the 13,000,000 barrels of increased recovery due to pressure maintenance. Further, Sun will have paid for only 39% of the program.

The Frosts argue that when they signed the 1974 agreement they did not intend to go back to the injection rate problems that had plagued them before. They, like Texaco, had only two choices: produce the water that was being flowed in on them or just go home and let Sun get the oil the others had given up on.

We next look to Sun's position. The water injection wells were carefully located by the parties. It was inevitable that the wells at the highest point on the reservoir would be the last to continue producing oil. The other parties knew that pressure is increased at the point where water is injected, causing the oil above to move, so they put the wells on the western side. Sun wanted the field to be unitized, but the Frosts wouldn't agree, so they had to work out some other system. They discussed, in 1954, the injection of water so each of them could recover more oil, and in April, 1954 they got the Railroad Commission to adopt Field Rule 19. It provides:

Rule 19: Water may be injected in the Seabreeze Sand for the purposes of maintaining, or regulating pressure, or otherwise increasing the recovery of hydrocarbons or protecting correlative rights, when authorized by the Commission after notice and hearing; provided however, that in the course of conducting injection operations the weighted average reservoir pressure is not increased above 3000 psig. At such hearing, the operator proposing injection operations shall submit for approval his injection plan, showing the location of input wells, the range of amounts of water to be injected, and the proposed date for commencing such operations. After an injection plan has been approved by the Railroad Commission, changes or modifications thereof shall be submitted to the Commission for approval after notice and hearing.

In July, 1954, the parties entered into a written water injection agreement, then drilled their first injection well in a Sun lease on the west side. Sun's wells on the west were the first to stop producing oil, so Sun got both the disadvantage and the advantage of the program. The 1954 contract recites that the water drive in the field is inadequate to support reasonable rates of production, so the program was initiated to supplement the natural water drive to arrest and equalize the declining pressure and increase recovery of oil. Further, that a joint program is the most efficient as it results in the greatest benefit to the reservoir as a whole. Enlargement of the water injection system required the consent of parties owning at least 95% of the injection system. The contract states that the program will protect the correlative rights of all parties owning mineral interests in the lands in question; Sun says this means that when the water pressure moved the oil up, each party would get more of it than it would otherwise obtain. The parties operated under this agreement for twenty years, then came to a disagreement. They decided to try a decreased rate of injection in 1974, but when it was over, Texaco and the Frosts took the position that the 1974 agreement means that upon its termination the previous program is halted with or without consent of the Railroad Commission. In 1974 the others proposed to severely reduce water injection, but an affirmative vote of parties owning 75% of producing wells was necessary to accomplish a reduction or a termination. That would permanently damage the reservoir, so Sun did not agree, but what the others really

wanted by then was unitization. Sun offered to try slightly reduced injection for a year to see whether reservoir pressure would decline as it predicted. An engineer employed by the Frosts was asked whether the Frosts received a substantial benefit from adopting the 1974 agreement in that they got reduced injection for seven months, an opportunity to try to unitize and to learn the effect of reduced injection. He replied that he thought Sun was injecting too much water but admitted that the 1974 agreement benefited the Frosts even if its intended effect was to have the injection rate revert to the prior rate upon termination of the agreement.

Sun argues that under that agreement, no matter who terminated the trial period, the parties would then go back to the prior program. It says that the parties had been operating under the water pressure agreement for twenty years but some of the parties were no longer satisfied with it, so they wanted to try something else while exploring the possibility of agreeing on a unitization plan. That the 1974 agreement clearly says that when it is terminated the parties are no longer bound by it (the 1974 agreement), so they are then left back under the 1954 agreement with an operator who has responsibility to maintain pressure and inject enough water to replace voidage, gas, and efflux. They were not left with an agreement that would permit the others to turn off the water and force Sun to accept their terms. Sun says the others don't want the injection system terminated, they just want it conducted under their terms, and under their interpretation any party, even those owning only 2% of the producing wells, could have entirely terminated the injection program if the parties could not agree upon a new rate.

■ We hold that the trial court did not err in submitting Special Issue No. 1 and that the evidence supports the jury's affirmative answer to that issue. The appellants assert that no party pleaded ambiguity, but Sun attached to its petition and incorporated by reference copies of the 1954, 1968 and 1974 agreements, and set forth the parties differing constructions of the 1974 agreement, relating its own interpretation in paragraph 7 of its petition:

"Plaintiff continued on such temporary rate of injection until November 1, 1975, but on that date had the right to cease it and revert to the pre-existing agreed program because Texaco on October 16, 1975, gave notice that it was terminating the temporary agreement."

Sun asserts that it has pleaded ambiguity in this paragraph of its petition:

"14. The plaintiff should be upheld in its contentions based upon the proper construction by this Court of the 1954 Contract. To resolve any ambiguities, such construction should be made only after hearing all of the surrounding facts and circumstances, including the facts showing the construction of the contract by the parties and the facts as to the agreed pressure maintenance program."

■ Although these allegations would have been clearer had they referred to the 1974 agreement, we hold that such pleadings along with the attached contracts gave the appellants fair notice that evidence would be offered to clarify an ambiguity. The 1974 agreement began: "This memorandum will evidence the agreement of all the parties owning an interest under *the subject agreement dated July 31, 1954*, which following agreement shall prevail notwithstanding the terms of such agreement. . . ." (emphasis added) Considering the 1974 agreement as a modification and integration of the 1954 one, it is reasonable to regard the interpretation problem as one involving the 1954 contract.

■ Further, no particular type of pleading is required by the Declaratory Judgments Act, and the pleadings of Sun should be liberally construed to support the judgment since there were no special exceptions. See *Anderson v. McRae*, 495 S.W.2d 351 (Tex.Civ.App.1973, no writ). The purpose of a suit for declaratory judgment is to obtain clarification of one's rights.

We next consider Texaco's points of error concerning the second special issue. That

issue inquired into the parties intent in executing the 1968 agreement, and only Texaco attacks it. Texaco's points of error are that Issue No. 2 should not have been submitted because 2) the agreement was not ambiguous and 4) no party pleaded ambiguity. Texaco asserts in its points of error 6) and 8) that as a matter of law the 1968 agreement does not encompass any agreed rates of injection, and 10) there is no evidence the parties mutually intended that the 1968 agreement set rates of water injection. Texaco says its motion for judgment *n. o. v.* should have been granted because 11) the evidence establishes as a matter of law that the 1968 agreement was mutually intended by the parties not to encompass any agreed rates of injection, and 12) because there is insufficient evidence that the parties mutually intended that injection be at capacity.

The 1968 letter agreement was written by Sun to the other parties, and they agreed to its terms. Its first five paragraphs are important to our consideration of these points. They provide:

"Sun Oil Company proposes the enlargement of the present injection system by the drilling of one additional salt water injection well (No. 4) and if necessary in Operator's opinion, an additional salt water supply well at the following location:

Said Injection Well No. 4 to be drilled to a total depth of 8,900 feet at a surface location of 1,000 feet South of the North line and 2,000 feet west of the East line of the O. H. Acom property, H. T. & B. RR. Co. Section 115, Abst. 147, Chambers County, Texas.

The purpose of this additional injection well is to provide an increase in water injection capacity for the Fig Ridge Pressure Maintenance Program, such program having been designed to supplement the inadequate natural water drive existing in the Fig Ridge (Seabreeze) Field, Chambers County, Texas.

If it is decided by the requisite percentage of the parties having an interest in the Fig Ridge Pressure Maintenance Pro-

gram that said well will be drilled. sun Oil Company will attempt to acquire the required property rights for all facilities for the joint account.

Sun also proposes the following operational conditions as part of our proposal to drill said additional injection well:

1. After sufficient approval is obtained from all parties to drill injection well No. 4 and if necessary as aforesaid an additional salt water supply well, and to install related facilities, and the required property rights are obtained, water injection into injection Well No. 2 will be reduced immediately to 24 percent of the total field injected volume. At the end of each month, a cumulative injection status will be calculated for Injection Well No. 2 so that adjustments in injection can be made in the succeeding month or months so as to maintain the aforesaid cumulative injection volume.

2. After Injection Well No. 4 is drilled and is receiving water, injection into Injection Well No. 2 will be set at a maximum of 25 percent of the total field injection volume. At the end of each month, a cumulative injection status will be calculated for Injection Well No. 2 so that adjustments in injection can be made in the succeeding month or months so as to maintain the aforesaid cumulative injection volume.

As provided in Paragraph 20 of the "Construction and Operating Agreement" any enlargement of the pressure maintenance system requires agreement by parties owning at least 95 percent of the system at the time of the proposed enlargement."

Briefly stated, Sun asserts that the second paragraph of the 1968 agreement shows that the additional well was drilled to allow injection of water at capacity while decreasing the amount to be injected in Well No. 2. Texaco says the injection rate was to remain unchanged but that injection through Well No. 2 would be decreased.

We will review Texaco's position concerning the circumstances surrounding execution of the 1968 agreement. Texaco strongly complained in 1967 and 1968 that water from Well No. 2, located near its lease, was pushing oil away and demanded relief. Various proposals were suggested, including drilling of a new well and the setting of an injection rate in terms of "capacity," the setting of a rate at different exact amounts such as 20,000 barrels of water per day, or the drilling of Well No. 4 and injection of equal volume into each of the four injection wells. None of these proposals was adopted; the only mention of "capacity" was:

> "The purpose of this additional injection well is to provide an increase in water injection capacity for the Fig Ridge Pressure Maintenance Program, such program having been designed to supplement the inadequate natural water drive existing in the Fig Ridge (Seabreeze) Field, Chambers County, Texas."

O. L. Sanders, who signed the 1968 agreement for Sun, testified about it as follows:

> "Q. In fact, it doesn't provide for any of the things, any of the several injection rate formulas that were under discussion between September and March, does it?
>
> "A. It provides for the injection by the operators of that water he can inject with the wells provided by the partners, by the other operators, to permit him to pursue the injection of salt water, to maintain the pressure, and try to arrest the decline in the Fig Ridge Field. And that is what he got out of it.
>
> "Q. The question, sir, is what is put into it?
>
> "A. And that is what was put in it.
>
> "Q. And in fact none of the language which we have been discussing was put into it?
>
> "A. I think it was put into it, implied.
>
> "Q. What? The 20,000?
>
> "A. Not the exact number. We could not agree on that. Those were not agreeable, apparently, to anyone."

The 1968 agreement was put into effect without discussion of rate of injection, and it worsened Texaco's problems by greatly increasing the injection rate. Sun's records show that its assertion that additional injection was needed in 1968 to stop pressure decline was not true, Texaco says.

Texaco argues that when the second paragraph of the 1968 agreement stated it was "to provide an increase in water injection capacity," it referred only to system capacity, not to rates of injection. Well No. 2 was to be reduced below its capacity, so additional capacity was required elsewhere to take up the slack. Texaco further asserts that there is no evidence that an increase in capacity was pursuant to the 1968 agreement, and the evidence shows that the parties other than Sun did not consider that agreement to agree on injection rates. Texaco and the Frosts did not consider Sun's over-injection to breach the 1968 agreement because they did not think it was referable to the agreement.

We next look to Sun's position as to some of the circumstances surrounding the signing of the 1968 agreement:

1. The injection program was created in 1954 to arrest declining reservoir pressure, and the three injection wells in being allowed pressure to decline.

2. In 1966 Sun proposed addition of two injection wells, but Texaco would not agree unless injection by Well No. 2 was decreased.

3. The parties did not agree on a solution until Texaco suggested drilling one more well because "increasing the injection rate in the southern portion of the field . . . is badly needed" even though this would "not provide any effective relief for the excessively high injection rate into Well number 2 . . . ."

4. After Well No. 2 was drilled, all but Well No. 2 were injected at capacity for five years without complaint from anyone.

Sun argues its position: Texaco is mistaken in saying that Well No. 4 was drilled only to redistribute injection away from Well No. 2. The proof shows that injection

for Well 2, one-third of the pre-1968 injection rate, was 5,567 barrels, but one fourth of the rate after completion of Well 4 was 6,599 barrels per day. This was understood by Texaco, because its February 5, 1968 letter states that "while this proposal does not provide any effective relief from the excessively high injection rate into Well No. 2," Texaco would agree to it in order to increase the rate of injection into the southern part of the field. Sun points out that the testimony of O. L. Sanders immediately following that quoted above was:

Q. Insofar as your language is concerned and the fact that it didn't include those words, it is true, is it not, that everybody approved the proposal that you submitted to them and you got back a vote in favor of drilling the fourth well under the terms you set forth?

A. Yes, sir.

We agree that the 1968 agreement was ambiguous since it was susceptible to these two meanings:

1. Sun says the 1968 agreement was intended to authorize water injection at the capacities of all the injection wells except No. 2, and it was authorized at 25%.

2. Texaco says the 1968 agreement did not authorize injection of Wells 1, 3, and 4 at capacity.

The Frosts have not raised any points of error on this question.

Neither party has complained by point of error about the admission of any specific evidence to remove the ambiguity of the words used in the agreement.

We hold that the evidence supports the jury's second finding.

We overrule Texaco's fourth point of error. Texaco did not timely object to the submission of Special Issue No. 2 on the ground of no pleading of ambiguity. The objection was waived. Rule 274, Texas Rules of Civil Procedure.

We consider Texaco's twelfth point of error to raise only the question of no evidence. A trial judge may not grant a

judgment notwithstanding the verdict on the basis of factual insufficiency. This point complains of the failure of the trial court to grant such motion and is not applicable to the granting of a new trial after entry of judgment. *McDonald v. New York Central Mutual Fire Insurance Co.,* 380 S.W.2d 545, 548 (Tex.1964).

Texaco's final point of error concerning the court's charge is that the instruction on "intent" was incorrect. Texaco also seems to be attacking the wording of the special issues as failing to point out the specific contractual language alleged to be ambiguous, but Texaco waived that matter by not objecting to the wording of the issues. Rule 279, Texas Rules of Civil Procedure. *O'Connor v. Gragg,* 161 Tex. 273, 339 S.W.2d 878, 885 (1960).

The instruction in the charge was:

"The word 'INTENT' as that term is used in this Charge means the purpose formed in the parties' mind as gathered from their actions.

You are further instructed that in determining the intent of the parties, you may take into consideration, in addition to the language used in the agreement, the facts and circumstances surrounding the making of the agreement.

You may further take into consideration any acts done by the parties in the performance of the agreement and any mutual interpreting actions of the parties in connection therewith."

This instruction is very similar to the instruction in *Trinity Universal Insurance Co. v. Ponsford Brothers,* 423 S.W.2d 571, 574 (Tex.1968). In that case it was held: "The court instructed the jury that they could take into consideration the facts and circumstances surrounding the making of the agreements set out in those documents as well as any acts done mutually by the parties in the performance of the agreements."

In our case the trial court added that intent means the purpose formed in the parties' mind as gathered from their actions, an instruction used in *Leopard v. Stanolind Oil & Gas Co.,* 220 S.W.2d 259

(Tex.Civ.App.1949, writ ref. n. r. e.). There was also added to the definition these words: "in addition to the language of the agreement." The trial judge gave a proper instruction.

Texaco and the Frosts assert that the trial court's judgment requiring approval from the Railroad Commission prior to any modification of the program is erroneous. The judgment ordered that Railroad Commission approval be obtained for any change in the rate of injection or any alteration, modification, change, enlargement, reduction or termination of the pressure maintenance program notwithstanding the provisions of the 1954 agreement. Sun's position is that Field Rule 19 requires such approval.

Rule 19: Water may be injected in the Seabreeze Sand for the purposes of maintaining, or regulating pressure, or otherwise increasing the recovery of hydrocarbons or protecting correlative rights, when authorized by the Commission after notice and hearing; provided however, that in the course of conducting injection operations the weighted average reservoir pressure is not increased above 3000 psig. At such hearing, the operator proposing injection operations shall submit for approval his injection plan, showing the location of input wells, the range of amounts of water to be injected, and the proposed date for commencing such operations. *After an injection plan has been approved by the Railroad Commission, changes or modifications thereof shall be submitted to the Commission for approval after notice and hearing.* [Emphasis added.]

Sun sought a declaration of the parties rights under Rule 19 in this suit. Construction of this Rule is merely a question of law so the agency need not apply its expertise for this problem. Referral to the Railroad Commission was not necessary. Sun's suit for declaratory judgment did not challenge validity of the Rule.

▮▮ Field Rule 19 requires the Commission's approval for changes or modifications of the program. The Frosts argue

that the court's judgment and Rule 19 attempt to confer on the Commission jurisdiction which has been expressly denied by Paragraph (g) of Article 6014, Texas Revised Civil Statutes. It provides:

"The production, storage or transportation of crude petroleum oil or of natural gas in such manner, in such amount, or under such conditions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among other things shall specifically include:

\* \* \* \* \* \*

(g) Waste or loss incident to, or resulting from, the unnecessary, inefficient, excessive or improper use of the reservoir energy, including the gas energy or water drive, in any well or pool; however, it is not the intent of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management, control or ownership."

Under this statute mandatory repressuring or unitization may not be required, but its provisions do not expressly deny the Commission's right to prevent the parties from discontinuing a program once it has been operational. The Railroad Commission is not confined solely to the prevention of waste but may promulgate field rules applicable to common reservoirs for the protection of correlative rights. *Phillips Petroleum Co. v. American Trading and Production Corp.,* 361 S.W.2d 942, 945 (Tex.Civ. App.1962, writ ref., n. r. e.). Field Rule 19, saying that changes or modifications *shall* be submitted for approval, is in keeping with the Commission's power to protect correlative rights, and the trial court's order is merely enforcing the Rule.

The Frosts also contend that the judgment confers contract jurisdiction on the Commission. The case at bar is not strictly a contract action but also involves the interpretation of the field rules which were attached as exhibit A to Sun's second amended original petition. Sun asked for injunctive relief requiring appellants to gain the Commission's approval prior to a cessation

of the injection. We overrule the Frosts' sixth and seventh points of error and Texaco's points fourteen and fifteen.

Texaco's thirteenth point of error contends that the trial court was without power to enforce Railroad Commission field rules. Our Supreme Court addressed the issue of primary jurisdiction of administrative agencies in *Gregg v. Delhi-Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411 (1961) and held that "[w]here the issue is one inherently judicial in nature . . ., the courts are not ousted from jurisdiction unless the Legislature, by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body."

The Frosts and Texaco allege error in the court's granting Sun recovery of their unpaid percentage of the cost of operating the program pending judgment. The Frosts assert in their eighth point of error that they were not obligated to reimburse Sun under a theory of express contract since Sun had been dismissed as the operator and argue against Sun's recovery under an implied contract theory. Texaco contends that Sun's agency to incur expenses had been revoked.

Sun replies that its recovery is based on the express contract. Paragraph 10 of the 1954 agreement provides:

"Monthly costs of operating such system shall be borne by each of the parties hereto in the proportion that the number of wells owned by such party bear to the total number of wells within the injection area, completed in the Seabreeze Sand, having had an allowable assigned to such well or wells during the previous month by the Railroad Commission of Texas."

Texaco refers to paragraph 12 of the 1954 agreement which delineates the accounting procedure:

"Operator shall pay and discharge all costs and expenses incurred in connection with the construction, maintenance, operation and abandonment of the system and shall charge and bill the other parties hereto in the proportion of their share thereof, on the basis as herein set forth, upon the cost and expense basis as provided for in the Accounting Procedure attached hereto and made a part hereof. Operator shall maintain accurate books and records of all expenses, costs and liabilities incurred in constructing and operating said system."

Paragraph 10 imposes a duty to pay but does not predicate that duty on the status as operator of the party who is to be reimbursed. Since the trial court found that obligations under the 1954 agreement had not been terminated the continued obligation to inject water into the field carried with it the continued obligation to pay for the water injection. Had the court found that the termination of the 1974 agreement suspended the injection program, the contract on operating expenses would no longer be enforceable against the appellants.

Texaco's points of error 17 through 19 assert error in the trial court's granting of injunctive relief. It first says that specific performance is not available because the contract is ambiguous and that Sun does not come to court with clean hands. At the time the court enjoined Texaco to continue the injection, the contractual duties under the 1968 agreement were no longer ambiguous but had been determined with certainty by the jury. The fact that Sun had maintained the operation after its dismissal as operator on November 1, 1975 was not adjudicated to be wrongful but was upheld by the judgment.

Texaco also alleges that the decree of injunction is too vague and indefinite to require compliance. The amount ordered injected is "the capacity of the four salt water injection wells then in use by the Plaintiff as operator and still in use to take salt water (the average being 26,400 barrels per day), with the only restriction being that only 25% of such water be injected into salt water injection well number two." This order seems to be entirely feasible since this is the manner in which the injection was determined prior to 1974. See *City of Wichita Falls v. Whitney*, 11 S.W.2d 404 (Tex.Civ.App.1928, writ dism'd). An

injunction should be as specific as the nature of the case allows. *San Antonio Bar Assoc. v. Guardian Abstract & Title Co.,* 156 Tex. 7, 291 S.W.2d 697 (1956).

The judgment of the trial court is affirmed.